UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| JUDY B. COLMAN, et al.,<br>Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 12-681-M-PAS |
| DAVID P. FAUCHER, et al.,<br>Defendants. | ) ) ) | |

## MEMORANDUM AND ORDER

JOHN J. McCONNELL, JR., United States District Judge.

Judy B. Colman and her daughter, Hadley Colman, brought this action[1] claiming civil rights violations, all stemming from what Ms. Colman contends was the gender discrimination-motivated failure to hire her as the head coach for the girls' lacrosse team at Portsmouth High School (PHS). She maintains that the Town of Portsmouth and the individual Defendants, all official actors of the Town,[2] intentionally discriminated against her because she is a woman and that in doing so they ran afoul of the Rhode Island Civil Rights Act (RICRA) and the Rhode Island Fair Employment Practices Act (RIFEPA).[3] The gist of Hadley Colman's claim is that she was the star player on the girl's lacrosse team until a new head coach was hired, that he failed to give her the playing time that she deserved, that in doing so he deprived her of a chance to advance to competitive college play, and that the treatment she received was in retaliation for

[1] The lawsuit was first filed in the Rhode Island Superior Court (Newport County), but was removed to federal court because Plaintiff Hadley Colman had alleged a federal statutory cause of action.

[2] The Colmans have sued the Finance/Personnel Director of the Town David P. Faucher, then-Athletic Director Michael Lunney, successful candidate Michael Borrosh, and the Town of Portsmouth itself.

[3] This Court has federal jurisdiction because Hadley Colman's Count V claim alleges a violation of Title IX, pursuant to 20 U.S.C. § 1681.

protected actions her mother undertook.  Hadley also claims a Title IX violation, pursuant to 20 U.S.C. § 1681.

Defendants moved for summary judgment.  (ECF No. 22).  Upon review of the parties' briefs and arguments, it is clear to the Court that its ruling on Defendants' motion is guided by the answer to the question of who should decide this dispute, a judge or a jury.  "[I]n cases involving women plaintiffs where legal arguments are frequently novel and innovative, where subtle issues of credibility, inferences, and close legal questions may be involved, where issues concerning the 'genuineness' or 'materiality' of facts are frequently intertwined with law, a single district judge may be a less preferable decision maker than a jury.  Juries are likely to be far more diverse and bring a broader range of perspectives to bear on the problem."  Elizabeth M. Schneider, *The Dangers of Summary Judgment:  Gender and Federal Civil Litigation*, 59 Rutgers L. Rev. 705, 713 (2007).  *See also Ganzy v. Allen Christian School*, 995 F. Supp. 340, 360-61 (E.D.N.Y. 1998) ("The complex history of women's rights, employment, and sexuality … as well as normal methods of determining witnesses' credibility, might lead different jurors to evaluate differently the veracity of the witnesses and the honesty of the Defendant's proffered reason for dismissal.  Under such circumstances, a decision by a cross-section of the community in a jury trial is appropriate.").  For that reason, a court granting summary judgment in employment discrimination cases has been termed "problematic," based on reports produced by the Eighth Circuit and the Ninth Circuit, because "summary judgment was more likely to be granted to defendants in employment discrimination cases involving women plaintiffs."  Schneider, *supra*, at 710.

## I.
## **Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure governs the summary judgment process.

It provides,

> (a) MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY
> JUDGMENT.
> A party may move for summary judgment, identifying each claim or defense —
> or the part of each claim or defense — on which summary judgment is sought.
> The court shall grant summary judgment if the movant shows that there is no
> genuine dispute as to any material fact and the movant is entitled to judgment as a
> matter of law.

By the terms of Rule 56, a party is entitled to summary judgment only if both conditions

specified in Rule 56 are met: that "no genuine dispute [exists] as to any material fact" and that

the undisputed facts demonstrate that the party is "entitled to judgment as a matter of law." *See*

*Knight v. Mills*, 836 F.2d 659, 664 (1st Cir. 1987) (undisputed material facts, together with

inferences drawn against the movant, "must lead to one reasonable conclusion in favor of the

movant" to justify summary judgment). A material fact is one that "might affect the outcome of

the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary will not

be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is a drastic remedy[4] because it deprives the parties of the opportunity

to have a jury determine the outcome as enshrined in the Seventh Amendment to the United

---

[4] For opinions setting forth this legal axiom, *see, e.g.*, *United States v. Bosurgi*, 530 F.2d 1105,
1110 (2d Cir. 1976); *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985); *Taylor v. Huffman*, No.
93-7162, 1994 WL 525073, at *3, 36 F.3d 1094 (4th Cir. 1994); *Powers v. Nassau Dev. Corp.*,
753 F.2d 457, 462 (5th Cir. 1985), *decision clarified on denial of reh'g*, 756 F.2d 1084 (5th Cir.
1985); *Kelly v. Georgia-Pac. Corp.*, No. 86-3828, 1987 WL 24142, at *2 (6th Cir. 1987);
*Milwaukee Cty. v. Northrop Data Sys., Inc.*, 602 F.2d 767, 774 (7th Cir. 1979); *Wabun-Inini v.
Sessions*, 900 F.2d 1234, 1238 (8th Cir. 1990); *Consol. Elec. Co. v. United States ex rel. Gough
Indus., Inc.*, 355 F.2d 437, 438 (9th Cir. 1966); *Guschke v. City of Oklahoma City*, 763 F.2d 379,
382 (10th Cir. 1985); *Mercantile Bank & Trust Co. v. Fid. & Deposit Co.*, 750 F.2d 838, 842

3

States Constitution ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."). Thus, the law requires that all reasonable inferences be drawn against the moving party and that summary judgment be granted if the undisputed facts and inferences that flow from them allow for only one reasonable conclusion in favor of the movant. *Knight*, 836 F.2d at 664 (citing *Anderson*, 477 U.S. at 251). This Court must "tak[e] the facts in the light most favorable to the non-moving party and draw[] all reasonable inferences in [her] favor." *Barraford v. T & N Ltd.*, 778 F.3d 258, 263 (1st Cir. 2015).

In this matter, for the reasons that follow, the Court finds that summary judgment should be GRANTED in favor of all Defendants with respect to Counts III through V, and summary judgment should be GRANTED in favor of Defendant Michael Borrosh (only) with respect to Counts I and II.  Summary Judgment is DENIED as to all other Defendants with respect to Counts I and II.

## II.
## Factual Background

In mid-February 2010, the PHS girls' lacrosse head coach Jeffrey McGuirl announced he was leaving his position.  (ECF No. 25-2 at 13).  Sometime before the open position was posted, however, PHS Booster member Michael Borrosh approached PHS Athletic Director Michael Lunney (A.D. Lunney) and expressed interest in the vacancy.[5]  A.D. Lunney informally offered the position to Mr. Borrosh, on the spot.  (ECF No. 25-3 at 23).

---

(11th Cir. 1985); *Greenberg v. Food & Drug Admin.*, 803 F.2d 1213, 1216 (D.C. Cir. 1986); *Selva & Sons, Inc. v. Nina Footwear, Inc.*, 705 F.2d 1316, 1323 (Fed. Cir. 1983).

[5] There was a suggestion that Mr. McGuirl had already recruited Mr. Borrosh as a volunteer assistant girls' lacrosse coach for the coming season.  (ECF No. 25-3 at 21).

PHS posted the vacancy online on February 21, 2010. (*Id.*). The job posting listed "coaching experience" as the only qualification with no additional details of the job requirements. (*Id.* at 24).

Judy Colman was at the time both the head coach for the PHS girls' tennis team and a volunteer assistant coach for the PHS girls' lacrosse team, assisting former Coach McGuirl during the 2009 season. Ms. Colman applied online once the open position was posted, but she was never interviewed. During the hiring process, Coach McGuirl was never asked about her performance as assistant coach. (ECF No. 25-2 at 12).

Instead, Mr. Borrosh "was brought in for an interview and hired as the girls' varsity coach on February 25 of 2010." (ECF No. 25-3 at 23). Several days after being hired, Mr. Borrosh did submit an online application. (ECF Nos. 26-4 at 9, 25-3 at 37).[6] According to the PHS principal Robert Littlefield, Mr. Borrosh did not submit the required resume and two letters of recommendation. (ECF No. 26-5 at 13). There were no other applications or other interviews. Mr. Borrosh's name was submitted to the School Board some weeks later, on or about March 9, 2010, and the Board approved his hiring. (ECF No. 25-3 at 27-28).[7]

---

[6] Mr. Borrosh said A.D. Lunney told him to complete the paperwork after giving him the job. (ECF Nos. 25-3 at 26, 26-4 at 8).

[7] As to the subsequent years of 2011 and 2012, there was testimony that once a coach was in position there was little formality to the renewal process. Although Ms. Colman complains of discrimination in 2011 and 2012, most of the information in the record centers on the 2010 initial hiring of Mr. Borrosh and the failure to interview and hire Ms. Colman.

### III.
### Plaintiffs' Claims

#### A.    Counts I and II:  Gender Discrimination[8]

Where there is no direct evidence of discriminatory animus, the protocol for proving a disparate treatment[9] claim of intentional gender discrimination through indirect evidence is settled and familiar, described by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-02 (1973).  It is a three-part exercise, consisting of a (1) prima facie case presented by the plaintiff, (2) a justification put forth by the defendants, and (3) an assessment of whether the purported justification is legitimate or a pretext for impermissible discrimination.  *Id.*

Whether a plaintiff has demonstrated a prima facie case is normally a jury question in the First Circuit.  *Rodriguez-Torres v. Caribbean Farms Mfr., Inc.*, 399 F.3d 52, 58-59 (1st Cir. 2005) (discussing jury instructions with respect to fourth step of *McDonnell Douglas* prima facie case analysis).  The *prima facie* case in a failure to hire context is itself a multi-step process, consisting of four elements.  First, the plaintiff must establish that she belongs to the protected group.  Second, she must show that she was qualified for the employment she sought.  Third, she must demonstrate she was denied employment.  And fourth, she must prove that a person with equal or inferior qualifications was hired.  *Id.* at 802.  Typically, as in this case, the first and third

---

[8] Judy Colman's RICRA and RIFEPA claims stem from the same allegations.  The Rhode Island Supreme Court analyzes both state statutory claims using substantive federal law from analogous causes of action.  *Casey v. Town of Portsmouth*, 861 A.2d 1032, 1037 (R.I. 2004) (analyzing RICRA and RIFEPA claims together).  Also, success in one generally carries with it success in the other, and vice versa.  *E.g. Rathbun v. Autozone, Inc.*, 253 F. Supp. 2d 226, 236 (D.R.I. 2003), *aff'd on other gnds.*, 361 F.3d 62 (1st Cir. 2004).

[9] Discrimination, to be actionable, may be intentional and deliberate, directed at a particular person "on account of" or "based on" a protected attribute such as gender; or it may be the unintentional result of the implementation of a facially neutral policy that impacts adversely and disproportionately a group sharing a protected characteristic.  *Watson v. Forth Worth Bank & Trust*, 487 U.S. 977, 985-87 (1988).  The latter, termed "disparate impact," is not an issue in this case.

elements are undisputed: Judy Colman is female and she was denied the employment she sought as head coach of the girls' lacrosse team.

The issue of qualifications in steps two and four is at the heart of this part of the analysis. The question of Ms. Colman's qualifications as well as her qualifications relative to Mr. Borrosh's are vigorously contested. For the reasons that follow, the Court finds, at this juncture, that these are jury issues[10] because Ms. Colman has presented sufficient evidence to support a prima facie case on Counts I and II with respect to all Defendants except Mr. Borrosh (*see infra* note 23).

### 1. *Prima facie case - Qualifications*

#### a.    *Ms. Colman's qualifications*

Ms. Colman's credentials to coach girls' lacrosse come from a variety of sources. First, she has a Bachelor of Science in recreational leadership from Ithaca College. (ECF No. 25-11 at 3). She holds all of the certifications that PHS required to coach – a Rhode Island Department of Education Coaching Certificate, a coach certification from the National Federation of State High School Associations (NFHS), and first-aid and CPR certification. (ECF No. 25-1 at 15). In addition, at the time she applied for the position at issue, she had completed all work required to receive the United States Women's Lacrosse Level 1 Coach's Certificate.[11] (*Id.*). Second, she performed well as a volunteer assistant coach of the girls' lacrosse team during the season preceding the 2010 vacancy. (ECF No. 25-2 at 9). In fact, former Coach McGuirl described

---

[10] *Rodriguez-Torres v. Caribbean Farms Mfr., Inc.*, 399 F.3d 52, 58 (1st Cir. 2005); *Rowlett v. Anheuser-Busch, Inc.*, 832 F.2d 194, 200 (1st Cir. 1987), *abrogated on other gnds by, Iacobucci v. Boulter*, 193 F.3d 14, 27 (1st Cir. 1999).

[11] Ms. Colman formally received the certificate on March 9, 2010. According to A.D. Lunney, the certification signifies that the recipient "has learned how to effectively teach fundamental skills and basic team tactics," "has learned how to work with youth in an age appropriate and safe manner," and "has learned how to choose drills to plan effective practices." (ECF No. 25-3 at 12). This certification is not required for a coaching position at PHS.

Ms. Colman as having helpful attributes during her year assisting him conducting drills and handling logistics. He had planned on Ms. Colman returning for the next season. (*Id.*). Third, she has been head coach of the successful girls' tennis team at PHS since 2008, stewarding the varsity team to the division championship. (ECF No. 25-11 at 3, 14). Finally, she was the very involved parent of two talented girls' lacrosse players, which had, in Coach McGuirl's opinion, given her both knowledge of the game and of the needs of girls playing it. (ECF No. 25-2 at 8).

Defendants contend in absolute terms, however, that Ms. Colman was not qualified to coach girls' lacrosse, primarily because she had never played the sport herself[12] and because her duties as assistant coach were low-level. Where, as here, the facts must be assessed in the light most favorable to the nonmoving party, Defendants' position does not impede Ms. Colman from satisfying step two of her prima facie case, for two reasons.

The paradigm that the Court looks to in reviewing Ms. Coleman's qualifications is PHS's posted job qualifications, of which "coaching experience" was the sole qualification listed. (ECF No. 25-3 at 24). A.D. Lunney testified at his deposition about various attributes and experience he looks for in a coach,[13] but nowhere did PHS post specific minimum experience levels or other skills that a head coach must possess to be considered qualified. Because it does not appear there were any clear criterion – much less rigorous ones – defining what "coaching experience" was sufficient to coach at PHS, Defendants are hard-pressed to convince the Court that Ms. Colman,

---

[12] *But see* Brian Leigh, *Top 10 College Football Head Coaches Who Never Played*, The Bleacher Report (Apr. 23, 2014), http://bleacherreport.com/articles/2038878-top-10-college-football-head-coaches-who-never-played.

[13] A.D. Lunney testified that a "great candidate" would demonstrate "effective communication, with athletes, positive motivational approaches, sportsmanship, teaching sportsmanship, leadership, good character, and teamwork." (ECF No. 25-3 at 7). He said that in the hiring process, he looks for the same qualities plus a track record of coaching success, knowledge of the game, and ability to build good character. (*Id.* at 16). He testified that Judy Colman demonstrated all these attributes in her work with the girls' tennis team. (*Id.* at 17).

in light of her coaching experience with both the lacrosse and tennis programs at PHS, was so wholly unqualified that there is, at least, no dispute for a jury to resolve.

### b.     Ms. Colman's v. Mr. Borrosh's qualifications

The fourth step Ms. Colman must prove to establish her prima facie case is that a person with equal or inferior qualifications was hired.  Her proof is similarly aided by PHS's lack of pre-determined or objective criterion in the posted job description.  Ms. Colman's and Mr. Borrosh's previous experiences and what each brings to the job of coaching are different and difficult to compare.  Without any objective criteria of what "coaching experience" means, neither party can claim to have demonstrated by undisputed factual evidence that he or she has superior qualifications.[14]

The Court has previously discussed Ms. Colman's qualifications and will now compare hers to Mr. Borrosh's experience.  Mr. Borrosh had coached youth sports. (ECF No. 26-4 at 5). Like Ms. Colman, his daughters played lacrosse.  He had a lengthy military career that Defendants assert as evidence of his leadership skills.  Mr. Borrosh played men's lacrosse on the inter-scholastic boys' lacrosse team for two years in high school and for part of his first year at the United States Naval Academy.  He also played intramural men's lacrosse in college and in some leagues after college. (*Id.* at 4-5).[15]

---

[14] *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 394 (6th Cir. 2008) (reversing grant of summary judgment for employer after finding that a plaintiff "possess[ing] some qualifications for managerial work which [the individual promoted] did not . . . . created a genuine issue of material fact.").

[15] Former Coach McGuirl asserted that, strategically, boys' and girls' lacrosse are "different sports." (ECF No. 25-2 at 4).  In fact, Coach McGuirl's experience with a former player of men's lacrosse turned coach casted doubt on the value of Mr. Borrosh's years of playing men's lacrosse.  His male assistant coach for girls' lacrosse in 2009 was unsuccessful, Coach McGuirl said, because he could not keep straight the radically different rules of boys' and girls' lacrosse. The confusion was so bad, Mr. McGuirl said, that this former male assistant would "be trying to

While Mr. Borrosh's incidental skills and experience might render him also qualified to coach, there is nothing in this list that, when compared to Ms. Colman's background, makes him indisputably more qualified. For example, how does Ms. Colman's several years of coaching tennis, plus a year of coaching the PHS girls' lacrosse team as an assistant coach, stack up against Mr. Borrosh's long military experience of leadership? How does Mr. Borrosh's time playing lacrosse stack up against Ms. Colman's years of shepherding a highly competitive, winning tennis team? How does Ms. Colman's year of coaching girls' lacrosse as an assistant, and her nearly completed certification in that particular sport, compare to Mr. Borrosh's time playing men's lacrosse? Interestingly, even at the time the season was upon him, on March 11, 2010, A.D. Lunney had no opinion as to which of the two was more qualified. (ECF No. 25-3 at 29).

Therefore, the Court finds that Ms. Colman has shown sufficient facts, viewed in the light most favorable to her and affording her all reasonable inferences from those facts, that she was qualified for the position and that she was at least as qualified as Mr. Borrosh. Ms. Colman must do more than create this factual issue, however, to warrant her claims going to the jury. She must also demonstrate that there is sufficient evidence for a jury to find that Defendants' purported reason for hiring Mr. Borrosh was pretextual. For if she merely presents a prima facie case, but cannot carry the burden of persuasion while jumping through the last of the *McDonnell Douglas* hoops, Defendants would be entitled to summary judgment.

### 2. *Defendants' Non-Discriminatory Justification*

The presentation of a prima facie case, as Ms. Colman has done, raises a presumption of discrimination and affords Defendants the opportunity to dispel it by putting forth a non-

---

tell me to do this and do that but we can't do that because that just doesn't function within the rules." (*Id.* at 7).

discriminatory motivation for their actions. *Soto-Feliciano v. Villa Cofresi Hotels, Inc.*, 779 F.3d 19, 23 (1st Cir. 2015) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)). Here, Defendants do not point to a competitive hiring process as a justification for hiring Mr. Borrosh. It is undisputed that while the position was posted on February 21, 2010, the job had already been informally offered to Mr. Borrosh even as applications were first being solicited. It was also undisputed that no one reviewed the applications that were ultimately submitted online.

Instead, Defendants put forth a single justification for their decision to hire Mr. Borrosh, a reason that explains, in their opinion, both the decision to eschew any competitive hiring process and to put Mr. Borrosh in the head coach position. According to Defendants, Mr. Borrosh fell into their laps just in time before the start of the season. They maintain that the lacrosse season was upon them, that the girls' team had no head coach, and that there was insufficient time to consider any other applicants. The Court finds that Defendants have, at least minimally, met their burden of production at this second phase of the burden-shifting paradigm.

### 3.   *Pretext*

Finally, using the *McDonnell Douglas* rubric, Ms. Colman must now show that the Defendants' justification was a mere pretext disguising a discriminatory motive. *Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003) ("improperly motivated by discrimination"). Ms. Colman may establish

> either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. [*Texas Dep't of Cmty Affairs v.]Burdine*, 450 U.S. [248] at 256 [(1981)]. A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action.

*White*, 533 F.3d at 392-93.

Judged against their own evidence and assessing all material facts in the record in the light most favorable to Ms. Colman, Defendants' rationale does not support Mr. Borrosh's hiring. The girls' lacrosse season was due to commence sometime after March 11, 2010.[16] In fact, the hiring was not formally accomplished until the School Board gave its approval on March 9, 2010. Thus, there were approximately nineteen days between the time the vacancy occurred and the time it was formally filled. A jury could reasonably determine that during that period there was ample time to post the position and receive applications – as evidenced by the fact that Defendants *did* post the position and *did* receive at least two applications. In fact, A.D. Lunney acknowledged that an entire hiring process can be accomplished in a week's time, and exactly one week elapsed between Mr. McGuirl announcing his resignation on February 18, 2010 and Mr. Borrosh being offered the job on February 25, 2010. (ECF No. 25-3 at 31). Therefore, a jury could find that Defendants' claim that they were over the proverbial barrel does not hold water when measured against the other evidence in the record.

At this final stage of the *McDonnell Douglas* analysis, Ms. Colman, having the benefit of the presumption of discrimination that arose from the prima facie case, must nonetheless demonstrate, by direct or circumstantial evidence, that the adverse employment action was discriminatory because of her gender. In this case, while evidence is circumstantial – there is nothing in this record to which Ms. Colman can point that provides direct evidence of an animus toward her as a woman – there is sufficient evidence, from which inferences may be drawn, such that a jury could make the determination of gender discrimination.

---

[16] There is no precise date in the record of the first practice or game. However, the implication is that the season had not yet begun when A.D. Lunney met with Ms. Colman and Mr. Borrosh on March 11, 2010 to discuss the possibility of their co-coaching.

Most significantly, Ms. Colman has produced records[17] showing that over a four-year period from 2009 to 2013, PHS did not interview a single woman for an athletic coaching job, despite the fact that twelve women applied for six different coaching positions. In addition, needless to say, none were hired. (ECF No. 25-1 at 42). This is not a disparate impact case,[18] and these records are produced *not* to make a statistical showing of discrimination but presumably, to show a pattern of disinterest in, or perhaps active opposition to, women candidates from which Ms. Colman hopes a jury will infer intent to discriminate against her. A plaintiff in a disparate treatment case, as here,

> may attempt to show that "others similarly situated to him in all relevant respects were treated differently by the employer." *Kosereis*, 331 F.3d at 214 (quoting *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999)). "Reasonableness is the touchstone" when considering comparators in a disparate treatment case; that is, "while the plaintiff's case and the comparison cases that he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances." *Conward*, 171 F.3d at 20. We ask

---

[17] For the twenty-one coaching positions contained in the records, the documents show the number of women and men applying, the number of each gender interviewed, and the gender of the person hired. In addition, Ms. Colman has submitted resumes of a number of women who applied but were not interviewed for these positions. It is not clear what percentage of total sports hiring these records represent. They are not 100% complete because Ms. Colman's own hiring as head tennis coach is not reflected in the paperwork. There is only one hiring reported for 2007 and none for 2008. Nonetheless, the Defendants have not produced any additional hiring records that would indicate that those relied upon by Ms. Colman are unrepresentative or inaccurate.

[18] Lurking not so silently behind Ms. Colman's allegations is dissatisfaction with PHS's hiring practices generally related to women. She hints at a disparate impact claim, when, for example, she tries to contest the 2011 and 2012 hiring decisions that were really a product of PHS's practice of re-hiring existing coaches without any competitive hiring process. In disparate impact cases, statistical evidence is relied upon to demonstrate that the disparate impact upon a protected class that is a consequence of some neutral policy is not likely to have occurred by chance. *Boston Police Superior Officers Fed'n v. City of Boston*, 147 F.3d 13, 22 (1st Cir. 1998). By implementing a facially neutral policy of re-hiring incumbents, obviously, any discrimination perpetuated earlier is continued. *Cf. E.E.O.C. v. Steamship Clerks Union, Local 1066*, 48 F.3d 594, 606 (1st Cir. 1995) (requirement that new union members had to be sponsored by existing members perpetuated all-white membership and demonstrated causation). The fact remains, though, that Ms. Colman has neither pleaded nor supported the showing necessary to succeed on a disparate impact basis.

whether "a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989), *overruled on other grounds by Educadores Puertorriqueños en Acción v. Hernández*, 367 F.3d 61, 64 (1st Cir. 2004).

*Ray v. Ropes & Gray LLP*, No. 14-1003, 2015 WL 5011753, at *10 (1st Cir. Aug. 25, 2015).

"Statistical evidence is permissible in the disparate treatment context to show that the employer's conduct conformed to a general pattern of discrimination." *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 79 (1st Cir. 2004). But, "statistical evidence of a company's general hiring patterns, although relevant, carries less probative weight," and "in and of itself, rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision." *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848 (1st Cir. 1993) (quoting *Cumpiano v. Banco Santander P.R.*, 902 F.2d 148, 156 (1st Cir. 1990)). It "may play a helpful role [], but only if it tends to prove the discriminatory intent of the decision makers involved." *Hillstrom v. Best W. TLC Hotel*, 354 F.3d 27, 32 (1st Cir. 2003). Therefore, "the central focus is 'less whether a pattern of discrimination existed and more how a particular individual was treated, and why.'" *LeBlanc*, 6 F.3d at 848 (alteration omitted) (quoting *Cumpiano*, 902 F.2d at 156).

While the numbers are small, and indeed women did not apply for fifteen of the twenty-one open positions, a review of the female candidates' resumes, along with the stark reality that not a single woman was granted even an interview over nearly a four-year period, raises a legitimate question for a jury to grapple with, in combination with all of the other evidence, about whether something other than qualifications was at play in the decision not to interview or hire many of the female applicants, including Ms. Colman. The compilation indicates that with one exception for an assistant coach in 2013, at least one woman applied for *each* opening for coaches of *girls'* teams: assistant coach for girls' softball coach in 2012, head coaches for girls'

14

cross-country and indoor track in 2011, head coach and assistant coach for girls' soccer in 2009, and coach for girls' indoor track in 2007. No female applicants were interviewed for any of these coaching jobs. (*Id.* at 42-43). The Court finds these comparators to be reasonable and to closely resemble the situation in which Ms. Colman found herself in the spring of 2010. Defendants have offered no "differentiating or mitigating circumstances" that would distinguish PHS's treatment of each female candidate. *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996).

This history or pattern is borne out by the outcome. A review of the coaching lineup shows that of the twenty-one head coach positions in 2011-12, only five were held by women (girls' and boys' tennis, swimming, gymnastics, and cheerleading). Four girls' sports teams – soccer, cross-country, basketball, and softball – had male coaches, head and assistants alike. There was no change the following year, except that the female swimming coach appears to have been replaced by a man. (ECF No. 25-19 at 11-18). It is difficult to collate some of the hiring information by year, but the Town lists twenty-six people interviewed for coaching positions, of which one was Judy Colman and only one other was a woman (interviewed for an assistant softball coaching position). (*Id.* at 8-10).

Other evidence in the record could further support an allegation that there were systematic difficulties in hiring women as coaches at PHS. In 2009, four men and three women applied for the girls' soccer team head coaching job. None of the women were interviewed. Two of the female candidates each had fourteen years of coaching experience (one with playing experience from middle school through college and the other with coaching experience abroad plus experience managing coaches). A male applicant who listed neither coaching nor playing

experience, but did present a career in the military that he advocated demonstrated leadership skills, was hired.  (ECF No. 25-8 at 72).[19]

In 2011, when PHS hired a girls' cross-country coach, it received two applications from men and one from a woman.  The woman, who was not even interviewed, had played college athletics for four years, and had coached girls' field hockey, lacrosse, and basketball as well as had been a head coach of both girls' and boys' cross-country teams.  In contrast, the man ultimately hired was a new teacher at PHS with one year or less of experience coaching track and no apparent athletic background.

Officials involved in PHS athletic coaching recruitment acknowledged that an increase in the number of women coaches would be desirable.  (ECF No. 25-6 at 10, ECF No. 25-3 at 7).  In the summer of 2009 and the fall of 2010, Ms. Colman herself had a conversation in which she pressed both Coach McGuirl and A.D. Lunney to hire women, mentioning possible candidates other than her.  (ECF No. 26-3 at 5, 7).  But, where the record shows that PHS *felt* women should be better represented, *felt* that girls should have more female role models, and *professed* to want to increase the number of women coaches, they made little effort to do so.  These statistics, coupled with other facts in the record, could assist Ms. Colman to convince a jury that PHS's reasons for not hiring her were a pretext for discrimination.

Ms. Colman's evidence of gender discrimination is, in this case, circumstantial.  That is not, however, uncommon in disparate treatment claims.  Discriminatory treatment is often subtle.

---

[19] The overwhelming number of people with military experience is men.  As of 2013, 85% of those in the active military were men.  By the Numbers: Women in the U.S. Military, CNN (Jan. 24, 2013), http://www.cnn.com/2013/01/24/us/military-women-glance/index.html.  In terms of military experience, 8% of the total veteran population as of 2009 was made up of women, according to the National Center for Veterans Analysis and Statistics.  America's Women Veterans: Military Service History and VA Benefits Utilization Statistics, Nat'l Ctr. For Veterans Analysis and Statistics, 5 (Nov. 23, 2011),
http://www.va.gov/vetdata/docs/specialreports/final_womens_report_3_2_12_v_7.pdf at 5.

And sometimes it is sincerely perceived, but not really there.  In discrimination cases to a greater extent than in other matters, judges must be particularly wary of viewing such evidence so much through their own experiential prisms that they fail to recognize conflicting factual inferences that should be resolved by juries.[20]

Ms. Colman has set forth a prima facie case of discrimination in accordance with *McDonnell Douglas*.  She has presented sufficient evidence in the record to rebut Defendants' articulated nondiscriminatory reasons for failing to hire her and to support her assertion that the Defendants' reason for their action was a pretext for a discriminatory purpose.  This factual and legal scenario merits a jury's consideration – the collective judgment of the community as opposed to this single judge – of whether Defendants discriminated against Ms. Colman because she is a woman.

This Court denies summary judgment on Counts I and II with respect to all of the Defendants, except Michael Borrosh.[21]

---

[20] In recent years, what has been termed the overuse of summary judgment in employment discrimination cases has attracted the attention of numerous scholars.  *See, e.g.,* Kevin M. Clermont and Stewart J. Schwab, *Employment Discrimination Plaintiffs in Federal Court: From Bad to Worse?*, 3 Harv. L. & Pol'y Rev. 103 (2009) (studying dockets from 1979 through 2006) and studies cited therein.

[21] There is no evidence that supports Michael Borrosh's liability for discriminatory hiring as alleged in Counts I and II.  Mr. Borrosh was neither Ms. Colman's employer nor a person who, according to the evidence put forth, had any significant involvement in the hiring decisions.  *See Wyss v. General Dynamics Corp.*, 24 F. Supp. 2d 202, 209 (D.R.I. 1998) (employers and "any person acting in the interest of an employer directly or indirectly are potentially liable.").  Certainly Mr. Borrosh had no involvement in the 2010 hiring except to have put himself forward as a candidate and to have accepted the position.  Neither action creates liability.  With respect to the failure to hire Ms. Colman in 2011 and 2012, Mr. Borrosh's involvement was limited to retaining the job.  All the evidence indicates that A.D. Lunney made the initial hiring decision and the Board ratified it on behalf of the Town.  The Court GRANTS summary judgment to Michael Borrosh on all claims against him.

**B.**     **Remaining Claims**

The remaining claims in the Complaint do not present the same disputed factual scenario requiring a jury's determination, and therefore summary judgment is appropriate. The Court will address them summarily below.

### *1.*     *Count III – RICRA Retaliation (Judy Colman)*

In Count III, Judy Colman contends that she was retaliated against by not being hired because she engaged in the protected activity of reporting an offensive email and by filing a complaint with the Rhode Island Commission for Human Rights (RICHR). A retaliation claim follows the same general rubric of other discrimination claims outlined by *McDonnell Douglas*. *Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 175 (1st Cir. 2015).

Ms. Colman's claim cannot survive a summary judgment motion because she has failed to produce a factual record of causation between her protected acts and Defendants' adverse employment action. First, with respect to the email, she reported to A.D. Lunney that she had received a sexually offensive email from what purported to be the account of a coach in another town. She does not allege that either A.D. Lunney or the Town was in any way responsible for her receiving the email. Thus, as a matter of logic, she can offer no reason as to why these Defendants would be motivated to retaliate against her because she complained of the email. Indeed, the evidence is that A.D. Lunney reported the email to the school principal who reported it to the Rhode Island Interscholastic League and offered to take further action that Ms. Colman refused. (ECF No. 26-3 at 15). Lacking any evidence that her reporting the email harmed any of the Defendants, there is no plausible causal connection to Defendants' failure to hire her.

With respect to the hiring decision in 2010, Ms. Colman's claim fails because the protected activity – filing an RICHR claim – came *after* the adverse employment decision. A

retaliation claim cannot succeed if the event that supposedly provides the motivation for retaliation occurs before the event that supposedly constitutes the retaliation. *Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79, 85 (1st Cir. 2006). Ms. Colman filed the RICHR complaint in July of 2010 – months after Mr. Borrosh had been hired instead of her. Thus, the failure to hire her in 2010 could not have been in retaliation for the filing of the complaint some four months later.

With respect to her allegation that the failure to hire her in 2011 and 2012 was in retaliation for her July 2010 RICHR complaint, all the evidence indicates that the 2011 and 2012 decisions were based on the Town's automatic retention of existing coaches. The *McDonnell Douglas* construct is employed, slightly modified, in retaliation claims and even if Ms. Colman could prove a causal connection, she would fail at the final stage of the analysis: the Town's explanation for not hiring her in 2011 and 2012 was its policy of retaining incumbents. There is no evidence that this policy was a pretext for retaliatory motivation.

Summary Judgment is GRANTED to all Defendants on Count III.

### 2.    *Count IV – RICRA Retaliation (Hadley Colman)*

Hadley Colman's claim is a third-party retaliation claim because there is a lack of identity between the person engaging in the "protected activities" (Judy Colman) and the person retaliated against (Hadley Colman).[22] She alleges she was retaliated against because of her

---

[22] There are no Rhode Island cases discussing the elements of a third-party retaliation claim. The United States Supreme Court has upheld, at least in theory, a retaliation claim brought under Title VII where a particular female employee engaged in the protected activity, but the retaliatory injury was suffered by her fiancé who was fired. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174 (2011) (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 69 (2006)). The United States Supreme Court held that the terminated fiancé had standing to maintain a lawsuit because he was also an employee and Title VII's anti-retaliation provision prohibits any employer action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.*

*mother's* "protected activities" as described above.   Specifically, Hadley alleges that the Defendants, in particular Michael Borrosh, retaliated by limiting her playing time, failing to name her captain, and depriving her of other perquisites of a "star" player.

Hadley's complaint does not sufficiently allege adverse grievances to sustain her claim. There is little in Rhode Island case law that defines "aggrieved" under RICRA but, borrowing from federal law, adverse actions in a retaliation claim must be material, and not merely "petty indignities." *Ahern v. Shinseki*, 629 F.3d 49, 56 (1st Cir. 2010). *See Croce v. State, Office of Adjutant General*, 881 A.2d 75, 80 at n.9 (R.I. 2005) ("Employers (including governmental employers) sometimes make decisions that cause inconvenience or discomfort for employees, but those decisions are actionable only if plaintiff can establish that they were motivated by a discriminatory animus.").   While being shuffled around in a lineup and losing playing time is not petty to an athlete, it is a normal course of events during an athletic team's season, and not every "unjust, unfair, or unpleasant" experience is actionable. *Ahern*, 629 F.3d at 51.   Additionally, while Hadley is likely convinced that her treatment during the 2010 season diminished her attractiveness to college recruiters, as well as the likelihood of receiving an athletic scholarship, this impact is entirely speculative.   She was only a sophomore at the time these activities occurred and what the future would have brought over the course of the next two years would be anyone's guess.

Moreover, Hadley's claim suffers from the same causation failure as her mother's Count III claim.   A causal relationship between the protected activities and the retaliatory activity depends entirely on an inference that Mr. Borrosh's coaching decisions regarding Hadley were motivated by animus against Judy Colman and not by strategic considerations relating to the team.   Hadley puts forth a sort of "ipso facto" logic, contending she was such a great player that

there could be no other explanation other than a retaliatory motivation for Mr. Borrosh's unfavorable treatment of her. It may be true, but there is nothing but speculation behind it. Neither the Court nor any jury is in a position, at least not without expert testimony, to evaluate Hadley Colman's level of skill or the reasonableness of strategic decisions Mr. Borrosh made as coach. A retaliation claim requires the same *McDonnell Douglas* exercise as other claims of discrimination, *Planadeball*, 793 F.3d at 175, and, ultimately, Hadley would have to show that Defendants' claim that the coaching decisions were legitimate tactical ones was but a pretext. Defendants put forth that these decisions were grounded in a desire to give other players a chance to play, to "shake up" the team. Mr. Borrosh testified that he tried different players in different positions. (ECF No. 26-4 at 14). No one, for example, played the entire time in all games any longer. (*Id.* at 20). Even assuming all of Hadley's claims about her athletic prowess were true, Hadley has failed to submit evidence that would carry her burden of proving that these reasons were merely pretextual.

Summary judgment is GRANTED to all Defendants on Count IV.

### 3.     *Count V - Gender Discrimination in Education (Hadley Colman)*

In Count V, Hadley Colman claims a violation of Title IX, 20 U.S.C. § 1681, which prohibits discrimination by public secondary schools, among others, "on the basis of sex." This Court, in denying Plaintiffs leave to amend the Complaint, previously reviewed the substance of Hadley's allegation that PHS disadvantaged "female students with its discriminatory hiring of male coaches over female coaches by a three-to-one ratio." (ECF No. 17 at 2). The Court denied leave to amend because Count V "is completely devoid of any facts or law sufficient to

allege a Title IX violation." (*Id.* at 2).  For the same reason, the Court GRANTS summary judgment to all Defendants[23] on Count V.[24]

## IV.
### Jurisdiction

Count V is the only count with direct federal jurisdiction, providing initial justification for removal of this action to federal court.  Only Counts I and II survive the instant Order, and they are both grounded in state law.  With the death of Count V, the Court is required to "reassess its jurisdiction [. . .] engaging in a pragmatic and case-specific evaluation of a variety of considerations that may bear on the issue." *Camelio v. Am. Fed.*, 137 F.3d 666, 672 (1st Cir. 1998).

When a case has been removed to federal court and the federal claim is disposed of before trial, it is within this Court's discretion to decide whether to keep the remaining state law claims or to remand them.  28 U.S.C.S. § 1367(c).  In this case, the remaining claims do not raise issues of novel or complex state law, and they are closely related to the claim that warranted federal jurisdiction.  *See Rodriguez v. Doral Mtg. Corp.*, 57 F.3d 1168, 1175-177 (holding that the court may exercise supplemental jurisdiction over state-law claims when those claims arise from the same nucleus of common facts and do not raise complex or novel issues of state law). Discovery has been completed in this matter, the surviving claims are ready to go to trial, and neither judicial efficiency nor the interests of the litigants would be served by jettisoning the matter from the Court's docket.  The Court will therefore retain jurisdiction of Counts I and II.

---

[23] Defendants A.D. Lunney and Mr. Borrosh would be entitled to summary judgment on Count V in any event because Title IX reaches "institutions and programs that receive federal funds … [and] has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009).

## V.
### Conclusion

For the reasons stated herein, Defendants' Motion for Summary Judgment (ECF No. 22)

is GRANTED on Counts I and II as to Defendant Michael Borrosh and DENIED as to all other

Defendants.  Summary judgment is GRANTED on Counts III, IV, and V.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
United States District Judge

September 11, 2015